[This opinion has been published in *Ohio Official Reports* at 73 Ohio St.3d 626.]

THE STATE OF OHIO, APPELLEE, *v*. ALLEN, APPELLANT.

[Cite as *State v. Allen*, 1995-Ohio-283.]

*Criminal law—Aggravated murder—Death penalty upheld, when.*

(No. 93-2377—Submitted April 25, 1995—Decided September 6, 1995.)

APPEAL from the Court of Appeals for Cuyahoga County, No. 62275.

————————————

{¶ 1} In June 1991, a Cuyahoga County jury returned guilty verdicts in the trial of appellant, David W. Allen ("Allen"), for the aggravated robbery and aggravated murder of eighty-four-year-old Chloie English ("English") of Bedford, Ohio. English knew Allen through her participation in a prison ministry program. English ministered to five convicted felons, including Allen. She visited and corresponded with Allen while he was in prison and they stayed in touch after his release in 1989. On January 9, 1991, English received a phone call from someone named "David." According to English's daughter, the conversation left English shaking.

{¶ 2} English was last seen alive at 5:45 p.m. on January 24, 1991, by her friend Judy Sperry ("Sperry") who had visited English in her home. At 6:45 p.m. the next day, English's friend Cathy Curry found English lying dead in her living room. The doors to English's house were unlocked, which was unusual because English always locked her doors and never opened them to strangers.

{¶ 3} After English's body was found, Bedford police officers secured, photographed, and searched the house. Detective Gerry Artl found English's eyeglasses on the floor and noted a large thumbprint on the inside of the left lens. That thumbprint turned out to belong to David Allen. Police recovered ten cigarette butts from English's kitchen garbage. Saliva tests showed that five of the butts had

been smoked by a Type O secretor.[1]  (The rest lacked sufficient saliva for testing.)  Two of the butts still had the "Doral" brand name on them.  Allen is a Type O secretor, and there was evidence that he smoked Dorals.  English disapproved of smoking and was a Type O non-secretor.

{¶ 4} Although English's last known visitor was a woman, someone had left the toilet seat up in English's bathroom.  Moreover, the coffee pot in the kitchen, empty when Sperry left, was half full when English's body was discovered.  Police found several items burnt in the fireplace, including the remains of English's purse and wallet, a broken ashtray, a broken coffee cup, a broken drinking glass, a wine bottle, and a knife with its handle burnt off.

{¶ 5} Police found no money in the house, even though English always kept about $50 in her wallet for emergencies.  English's credit cards and checkbook were also missing.

{¶ 6} Detective Timothy Oleksiak ("Oleksiak") obtained the names of prisoners with whom English had corresponded.  All but Allen were still in prison.  Oleksiak and Artl had the print on the eyeglasses compared with Allen's; when the print was identified as Allen's, Oleksiak got an arrest warrant.

{¶ 7} On January 29, Allen was arrested.  He was wearing a denim jacket with a stain on one of the sleeves.  That stain turned out to be Type O blood, the same type Allen and English shared.  Allen was carrying a bus transfer issued between 6:04 and 7:00 a.m., January 25, on the No. 41 Warrensville bus route.  The driver identified Allen as a passenger he had picked up on January 25 at 6:04 a.m., at a stop 1.3 miles from English's house.

{¶ 8} Allen also had a refund receipt for a Greyhound bus ticket.  There was no record of when the ticket was sold, but Allen got the refund on January 25, at

---

1. Trace-evidence expert Kay May testified that certain individuals secrete their blood type in bodily fluids, such as saliva.

11:28 p.m.  Moreover, when Detective Artl searched Allen's bedroom, he found two packed suitcases under Allen's bed.

{¶ 9} The jury returned guilty verdicts on two counts of aggravated murder, R.C. 2903.01(A) and (B), each count having a death specification under R.C. 2929.04(A)(7) (felony-murder).  The jury also found Allen guilty of aggravated robbery, R.C. 2911.01.  After a penalty hearing, the jury recommended the death penalty.  The court accepted the recommendation and imposed the death sentence.  As to the aggravated robbery count, the court imposed a sentence of fifteen to twenty-five years.  The court of appeals affirmed the convictions and sentences.

{¶ 10} This cause is now before the court upon an appeal as of right.

_____

*Stephanie Tubbs Jones*, Cuyahoga County Prosecuting Attorney, *Thomas Sammon, Timothy Dobeck* and *Elaine Welsh*, Assistant Prosecuting Attorneys, for appellee.

*Gloria Eyerly*, Ohio Public Defender, *Kathleen A. McGarry* and *Jane P. Perry*, Assistant Public Defenders, for appellant.

_____

Соок, J.

{¶ 11} We have reviewed Allen's twenty-three propositions of law, independently weighed the aggravating circumstance against the mitigating factors and evaluated the proportionality and appropriateness of the death penalty.  For the following reasons, we affirm the judgment of the court of appeals and uphold the convictions and death sentence.

{¶ 12} Pursuant to R.C. 2929.05, this court is required to review capital cases in a specific way; however, that section does not require us to discuss each and every proposition of law raised by the parties.  *State v. Scudder* (1994), 71 Ohio St.3d 263, 267, 643 N.E.2d 524, 528; *State v. Poindexter* (1988), 36 Ohio St.3d 1,

3, 520 N.E.2d 568, 570.  Accordingly, in this opinion we address only those issues that warrant discussion.

## I

## The Guilt Phase

### A. Jury Issues

#### 1. Alleged Bias

{¶ 13} In his first proposition of law, Allen contends that juror Worthington should have been excused for cause because she could not be fair and impartial and was biased against him.  Juror Worthington's brother had been murdered, and the alleged killer was acquitted.  On voir dire, Worthington admitted to some bitterness, but said she could set her feelings aside and vote solely on the evidence.  Although Worthington was unsure if she could hold back her emotions on hearing testimony similar to that at her brother's trial, she answered "no" when asked if her feelings would "impact" on the case.  Additionally, Allen points out that Worthington had two friends who were police officers, and the prosecutor and detective who investigated her brother's murder sometimes "checked-up" on her mother.

{¶ 14} When the defense challenged Worthington, the court noted that she "unequivocally stated that she could be fair and impartial."  The court found Worthington was "very straightforward" and "under[stood] the responsibility here * * *."

{¶ 15} The trial court's ruling on a challenge for cause will be affirmed if supported by substantial testimony.  *State v. Tyler* (1990), 50 Ohio St.3d 24, 31, 553 N.E.2d 576, 587.  Here, the trial court found Worthington unbiased, a finding supported by Worthington's testimony.  Allen argues that the juror's belief in her own impartiality is insufficient support, but the trial judge saw and heard Worthington and could legitimately validate her statements.  See *Tyler* at 30, 553 N.E.2d at 586; *State v. Henderson* (1988), 39 Ohio St.3d 24, 26-27, 528 N.E.2d 1237, 1241.  Allen's first proposition of law lacks merit.

*2. Voir Dire Issues*

{¶ 16} In his second proposition of law, Allen contends that veniremen Skufca and Washington, who stated that they could not impose the death penalty, were improperly stricken from the venire. See, generally, *Witherspoon v. Illinois* (1968), 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776. Allen claims the trial court improperly restricted his questioning of them. However, defense counsel questioned Skufca after she said she didn't believe she could impose the death penalty. Although the court did excuse her after only two questions by the defense, the defense apparently had no more questions and alleged no deprivation of voir dire. During Washington's voir dire, the trial court sustained objections to three defense questions; however, all three repeated questions the judge had already asked. Allen also argues that the trial court should have allowed the defense to ask Washington whether he understood "that only the Judge can decide ultimately what the sentence is," because it "downplayed to the jurors, the significance of their verdict * * *." This court has previously found that such an instruction does not constitute prejudicial error, *State v. Landrum* (1990), 53 Ohio St.3d 107, 122, 559 N.E.2d 710, 727, although we have expressed a *preference* that this instruction be avoided. *Id.*, citing *State v. Williams* (1986), 23 Ohio St.3d 16, 22, 23 OBR 13, 19, 490 N.E.2d 906, 912.

{¶ 17} In part B of Allen's second proposition of law, he complains that the state peremptorily challenged a juror because she opposed the death penalty. Allen waived this issue by not raising it at trial. See *State v. Campbell* (1994), 69 Ohio St.3d 38, 40-41, 630 N.E.2d 339, 344. Furthermore, "[a]part from excluding jurors based on race * * * or gender 'prosecutors can exercise a peremptory challenge for any reason, without inquiry, and without a court's control.' " (Citations omitted.) *State v. Lundgren* (1995), 73 Ohio St. 474, ____; 653 N.E.2d 304. The second proposition of law is overruled in its entirety.

### 3. Judge's Note to Jury

{¶ 18} In his eighteenth proposition of law, Allen claims that he was denied a fair trial because the trial court communicated with the jury outside his presence. During penalty phase deliberations, the jury sent the judge a note asking for "a copy of DSM III-R[2] and [d]ictionary[.]" The judge wrote back: "You have received all of the exhibits that have been received into evidence and you may not receive any others. No extraneous research may be done (i.e., looking up words in a dictionary etc.)"

{¶ 19} A trial judge may not communicate with the jury in the defendant's absence. *State v. Abrams* (1974), 39 Ohio St.2d 53, 56, 68 O.O.2d 30, 32, 313 N.E.2d 823, 825; *Bostic v.Connor* (1988), 37 Ohio St.3d 144, 149, 524 N.E.2d 881, 886. However, if the communication is not "substantive," the error is harmless. *State v. Jenkins* (1984), 15 Ohio St.3d 164, 236-237, 15 OBR 311, 373-374, 473 N.E.2d 264, 324; accord *Abrams, supra*, and *Bostic, supra*. In *Bostic,* we held that the court's *ex parte* communication with the jury was harmless error because there was "no possibility that the jury's conclusion was influenced by the court's reply." *Id.* at 150, 524 N.E.2d at 887. Likewise, in this case there is no possibility that the court's refusal to supply a dictionary and DSM III-R could have influenced the jury's conclusion. The eighteenth proposition of law lacks merit.

---

2. "DSM III-R" refers to the Third Edition of the Diagnostics and Statistical Manual of the American Psychiatric Association. Dr. Kaplan, a clinical psychologist who testified in this case, explained that it is a publication used by mental health professionals for classifying psychiatric and emotional problems and diseases and defects and determining their existence.

### B. Evidentiary Issues

#### 1. Sufficiency

{¶ 20} In his fourth proposition of law, Allen contends that the evidence of each count and specification was legally insufficient to convict him. The test for the sufficiency of evidence is whether any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found the elements of the crime beyond a reasonable doubt. *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 99 S.Ct. 2781, 2788-2789, 61 L.Ed.2d 560, 573; *State v. Jenks* (1991), 61 Ohio St.3d 259, 273, 574 N.E.2d 492, 503.

{¶ 21} As to the aggravated murder count, Allen claims the state did not prove he was the killer. The strongest evidence of Allen's guilt is the presence of his partial thumbprint on English's glasses. That print could not have been left days before the murder as Allen argues. It was on the *inside* of the lens, and English wore her glasses "constantly." Moreover, the print covers nearly half the lens. There was testimony that English was a tidy person, from which the jury could infer that she would not have allowed a large thumbprint to remain on her glasses for days. Allen's mistaken claim that the print wasn't that large is based on a misreading of the fingerprint expert's comment, "It's a very little area"; this comment refers to the area of the thumb represented by the print, not the area of the lens covered. Allen also suggests that the expert might have misidentified the print, since he found "only" in excess of twelve to fourteen matching ridge characteristics out of a possible seventy-five to one hundred twenty-five. However, the fingerprint expert testified that twelve matches are enough for an identification.

{¶ 22} There was also evidence presented that about two weeks before her murder, English got a phone call from someone named "David" that left her "shaking." That suggests that Allen was hostile to English, despite their earlier friendship. Furthermore, there was evidence that English was killed by someone she knew. English never unlocked her doors to strangers, yet on the evening that

her body was discovered her doors were found unlocked, with no signs of forced entry. English made coffee after Sperry left, and a coffee cup was found burned in the fireplace in an apparent attempt to destroy fingerprints. From that evidence the jury may have concluded that the killer shared a cup of coffee with English, another indication that English knew her killer.

{¶ 23} Inside English's home, police found several Doral brand cigarette butts, which had been smoked by a Type O secretor; Allen is a Type O secretor [3] and there was testimony that he smoked Dorals. Someone burned an ashtray in English's fireplace, apparently to destroy fingerprints. Moreover, English disapproved of smoking, and even her daughter did not feel free to smoke in her home. Based on this evidence the jury could conclude that the killer smoked the cigarettes found in English's home.

{¶ 24} There was evidence that Allen boarded a bus at a bus stop just 1.3 miles from English's home at 6:04 a.m., January 25, 1991, yet he was not going to or from work. The coroner estimated that English died between midnight and 6:00 a.m. on January 25. Allen points out that some of the coroner's testimony indicates that English died between 12:38 p.m. and 10:38 p.m., on January 24; however, the jury was entitled to accept the coroner's estimated time of death. Even if English did die in the afternoon or evening of January 24, Allen's presence at the bus stop near English's home in the early morning of January 25 could still be viewed by the jury as incriminating.

{¶ 25} There was also some evidence that Allen had prepared to flee. He had evidently purchased a Greyhound bus ticket (although he did turn it in for a refund), and packed his bags. He did not go to work on January 25.

---

3. Trace expert Kay May testified that 32.4 percent of the white population are Type O secretors.

**{¶ 26}** Finally, the jury could find prior calculation and design, necessary for an aggravated murder conviction, based on the protracted nature of the murder. English was beaten and strangled; her wrists were slashed; and she was stabbed sixteen times, with three of the wounds being in her back.

**{¶ 27}** Allen next contends that there was insufficient evidence that he committed aggravated robbery; specifically, he claims there was no evidence that he committed a theft. We find that there was sufficient evidence that Allen committed a theft. English kept five credit cards, a checkbook, and a wallet containing cash in her purse, yet none of these items were found in her house. The burned remains of her purse and wallet were found in the fireplace. English received a $104 monthly pension and a monthly gift of $100 from her daughter Sharon. Her daughter Janet gave her $100 for her birthday on January 9. Allen argues that English could have spent or given away all of her money, but Janet testified that her mother always kept about $50 on hand for emergencies. From this evidence, the jury could reasonably find that money, checks, and credit cards should have been present. The absence of these items along with the burned purse and wallet and the evidence of Allen's presence in English's home was sufficient for a reasonable jury to conclude that Allen committed aggravated robbery.

**{¶ 28}** Based on the foregoing we find that there was sufficient evidence for the jury to find Allen guilty of aggravated murder and aggravated robbery. Allen's fourth proposition of law is overruled.

### 2. Character Evidence

**{¶ 29}** In his third proposition of law Allen claims he was denied a fair trial because of the introduction of evidence that he was previously incarcerated. This evidence came in through testimony that English met Allen through her church's prison ministry program.

**{¶ 30}** Allen challenges the prior-imprisonment evidence as inadmissible "other acts" evidence. However, Evid. R. 404(B) allows "other acts" evidence as

proof of identity. Since English was apparently killed by someone she knew, the prior-imprisonment evidence was relevant to explain that English knew Allen through visiting him in prison.

{¶ 31} Allen's argument under Evid. R. 403(A) also fails. Pursuant to Evid. R. 403(A), the court is required to weigh the probative value of the evidence against the danger of unfair prejudice, confusion of the issue, or misleading the jury. When considering evidence under Evid. R. 403, the trial court is vested with broad discretion and an appellate court should not interfere absent a clear abuse of that discretion. *State v. Morales* (1987), 32 Ohio St.3d 252, 257-258, 513 N.E.2d 267, 273-274. Allen never denied English knew him, and the state had other evidence of the fact. However, the judge took steps to minimize unfair prejudice, forbidding the state to mention why Allen had been in prison and instructing the jury: "[Y]ou may not infer that the defendant is guilty of these offenses because he may have been convicted and incarcerated in the past." Thus, the trial court did not abuse its discretion by finding that potential unfair prejudice did not substantially outweigh the relevance of the testimony. Allen's third proposition of law is overruled.

{¶ 32} In his sixth proposition of law, Allen contends that the state introduced irrelevant, prejudicial evidence of the victim's good character during trial. Allen failed to object to the alleged character evidence and therefore waived this argument. See *State v. Williams* (1977), 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, vacated on other grounds (1978), 438 U.S. 911, 98 S.Ct. 3137, 57 L.Ed.2d 1156.

{¶ 33} Furthermore, Allen's claims regarding evidence of English's character have no merit. Evidence about a victim is admissible when it relates directly to the circumstances of the crime and is not offered to elicit sympathy from the jury. *State v. Williams* (1988), 38 Ohio St.3d 346, 354, 528 N.E.2d 910, 919-920. The evidence that Allen complains about was not offered to elicit sympathy from the jury; rather, the testimony related directly to the circumstances of the

murder and the robbery. Testimony that English did not drink or smoke was relevant, because a wine bottle and cigarette butts were found in her house. Testimony that she was an immaculate housekeeper was relevant to show that she likely would have wiped Allen's fingerprint off her glasses had he placed it there before the murder. This was "habit" evidence, admissible under Evid. R. 406, not character evidence.

{¶ 34} Evidence showing English's religious devotion was also relevant for non-character purposes. The "praying hands" design on the wallet identified it as hers. Her dedication to helping sinners "straighten * * * out" explained her friendship with Allen. Her habit of baking things for people was relevant to her spending habits.

{¶ 35} Cathy Curry, who found the body, testified that English taught Sunday school, knew the Bible, taught Curry how to make pecan tarts, and attended a monthly prayer meeting. The prayer meeting explained what Curry was doing at English's house: Curry had come to take English to that meeting. The other facts explained Curry's relationship with English and knowledge of her habits. See *State v. Waddy* (1992), 63 Ohio St.3d 424, 444, 588 N.E.2d 819, 834.

{¶ 36} English's friend Constance Dickson testified that English rose early for morning devotions. This evidence of English's habit was relevant because English had not put out her garbage on the morning of January 25. English's habitual early rising explained why this non-occurrence was unusual, narrowing the time of death.

{¶ 37} Allen's sixth proposition of law lacks merit because the evidence about English related directly to the circumstances of the crimes.

*3. Photographic "Show-up" Identification*

**{¶ 38}** Police showed bus driver Gilbert Pittman a photo of Allen, whom he identified as the person he picked up at 6:04 a.m. on January 25. In Allen's ninth proposition of law, he claims the identification was tainted by the "unnecessarily suggestive" use of a single photo instead of an array. See *Stovall v. Denno* (1967), 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199, 1206. However, Allen stipulated to the identification at trial and never moved to suppress it. As a result, Allen's claims of error are deemed to be waived. *State v. Cook* (1992), 65 Ohio St.3d 516, 523, 605 N.E.2d 70, 79.

**{¶ 39}** Even if Allen had raised this objection at trial, Pittman's identification testimony was properly admitted. Use of a single photo may have been "suggestive"; however, reliable identification testimony may be admitted regardless of the flaws in the identification procedure. *State v. Jells* (1990), 53 Ohio St.3d 22, 26-27, 559 N.E.2d 464, 469-470. The test for determining the admissibility of a photographic identification is " 'whether under the "totality of the circumstances" the identification was reliable even though the confrontation procedure was suggestive.' " *Id.* at 27, 559 N.E.2d at 469. The factors to be considered include the opportunity of the witness to view the criminal at the time of the crime and the witness's degree of attention. *Id.* Allen boarded the bus near a streetlight, was the only passenger for seven minutes, and conversed with Pittman. Moreover, Pittman's identification of Allen is verified by Allen's possession of the transfer slip. Accordingly, we find that under the totality of the circumstances the identification was reliable, and we reject the ninth proposition of law.

*4. Authentication*

**{¶ 40}** In his seventh proposition of law, Allen claims the blood samples, shoes, jeans jacket and bus transfer were not properly authenticated. See Evid. R. 901. However, Allen never made this objection at trial, and thus waived this issue absent plain error. See *State v. Wiles* (1991), 59 Ohio St.3d 71, 86, 571 N.E.2d 96-

97, 116. Plain error occurs when, but for the error, the outcome of the trial clearly would have been otherwise. *State v. Long* (1978), 53 Ohio St.2d 91, 96-97, 7 O.O.3d 178, 181, 372 N.E.2d 804, 807-808. We find no plain error in this instance. Although probative, the admission of these items into evidence did not alter the outcome of this case. The blood sample was used to link Allen's blood type to that found on the cigarette butts in English's wastebasket. This evidence was not determinative of the case because the trace evidence examiner testified that forty-five percent of whites have Type O blood and, of that forty-five percent, seventy-two percent are secretors. The jeans jacket, shoes and bus transfer are also not determinative of the case. These items were introduced as the items worn by Allen when he was arrested. The jeans jacket had Type O blood on it; however, both Allen and English had Type O blood. The shoes had an unidentified black substance on them, possibly ash from English's fireplace, and the bus transfer placed Allen at a bus stop 1.3 miles from English's home. Given the ample evidence of Allen's guilt in addition to these items, we do not find plain error in the admission of these items. The seventh proposition of law lacks merit and is overruled.

### 5. Other Evidentiary Issues

{¶ 41} In his fifth, eighth, tenth and eleventh propositions of law Allen claims various errors involving evidentiary issues. Each of these propositions of law is discussed below.

{¶ 42} In his fifth proposition of law, Allen contends that it was error for the trial court to allow prosecution exhibits to be displayed in open court before their formal admission into evidence, which did not occur until after the state had rested its case. Allen failed to object to the display of the exhibits at trial and consequently waived any claim, absent plain error. See *State v. Esparza* (1988), 39 Ohio St.3d 8, 529 N.E.2d 192. There is no plain error because none of the state's exhibits were ruled inadmissible, so there can be no prejudice since all the exhibits

13

which were displayed eventually went to the jury. Furthermore, Evid.R. 611 grants the trial court discretion over the mode of the presentation of evidence. Evid.R. 611(A). The fifth proposition of law lacks merit.

{¶ 43} In his eighth proposition of law, Allen complains that the state's expert witnesses gave impermissible testimony. First, Allen claims that trace-evidence-examiner Kay May's ("May") answers to several questions on redirect should have been stricken because they were not based on a reasonable degree of medical certainty. See Evid.R. 403. Specifically he complains about May's responses that (1) items burned in English's fireplace, including a knife and scissors, could not be tested for blood, and thus "could have" had blood on them, and (2) it was "possible" that the black substance found on the bottom of shoes which allegedly belonged to Allen was ash.

{¶ 44} May did not provide an improper opinion that blood had been on the knife and scissors; she merely explained that she did not find blood on the objects but could not rule out the possibility that blood could have been on the objects at some time. She did not testify that the substance on the shoes was in fact ash; she said she could not rule that possibility out. We do not find any error in the admission of this testimony. See *State v. D'Ambrosio* (1993), 67 Ohio St.3d 185, 191, 616 N.E.2d 909, 915; *State v. Bayless* (1976), 48 Ohio St.2d 73, 111-112, 2 O.O.3d 249, 270, 357 N.E.2d 1035, 1058-1059, vacated on other grounds (1978), 438 U.S. 911, 98 S.Ct. 3135, 57 L.Ed.2d 1155.

{¶ 45} Allen also complains about the following question asked of Detective Edward Walsh, the fingerprint expert: "[Y]ou don't go walking around with a fingerprint on your eyeglasses normally, do you?" He answered, "No. I do not." Allen contends Walsh was not an expert "on whether people immediately clean their glasses when a fingerprint gets on them. * * *" But Walsh did not purport to give an expert opinion on that subject; his response was specifically limited to his personal experience. The jurors were free to rely on their common

sense and experience in determining the length of time the victim would have allowed Allen's fingerprint to remain on her glasses.

{¶ 46} Lastly, Allen argues that these responses from the experts were "given an air of credibility" by the jury because they were offered by expert witnesses. This argument lacks merit because the trial court cautioned the jurors that expert testimony was entitled to no more weight than the testimony of any other witness. Allen's eighth proposition of law is overruled.

{¶ 47} In his tenth proposition of law, Allen asserts that the state introduced repetitive, gruesome photos of English's body, as well as a crime-scene videotape. Specifically, Allen argues that exhibits 1 though 16, photos of the victim's body, are gruesome and repetitive. "Under Evid.R. 403 and 611(A), the admission of photographs is left to the sound discretion of the trial court." *State v. Maurer* (1984), 15 Ohio St.3d 239, 264, 15 OBR 379, 401, 473 N.E.2d 768, 791. Allen has failed to show how the trial court abused its discretion by admitting the photographs. The test Allen cites from *Maurer*, which prohibits repetitive photos, is the standard for admitting *gruesome* photographs. "Absent gruesomeness or shock value, it is difficult to imagine how the sheer number of photographs admitted can result in prejudice requiring reversal." *State v. DePew* (1988), 38 Ohio St.3d 275, 281, 528 N.E.2d 542, 550; see, also, *State v. Davis* (1992), 62 Ohio St.3d 326, 348, 581 N.E.2d 1362, 1380. The photographs admitted in this case were not particularly gruesome or shocking. The photographs clarified the testimony regarding the number, type and placement of the wounds, and the cause of death. We find that the probative value of the photographs outweighed any prejudice to Allen. *State v. Maurer*, *supra.*

{¶ 48} As to the videotape of the crime scene, Allen failed to object to its introduction and therefore waived that claim. See *State v. Wiles* (1991), 59 Ohio St.3d 71, 86, 571 N.E.2d 97, 116. Allen's tenth proposition of law is not well taken.

{¶ 49} In his eleventh proposition of law, Allen contends that the trial court erroneously admitted both physical exhibits and photographs of those exhibits. He claims the photos were cumulative. Allen failed to object to the admission of these exhibits and therefore waived this issue absent plain error. *State v. Watson* (1991), 61 Ohio St.3d 1, 7-8, 572 N.E.2d. 97, 104. Furthermore, we find that the photographs were admissible because they show the items that were admitted into evidence in the location where they were found. The photographs serve to show the condition of the items when they were discovered and to authenticate the items. See *State v. Murphy* ( 1992), 65 Ohio St.3d 554, 581, 605 N.E.2d 884, 906. The eleventh proposition of law is overruled.

### C. Instructional Issues

{¶ 50} In his thirteenth proposition of law, Allen claims the jury instructions were deficient in several ways.

### 1. Lesser Included Offense

{¶ 51} Allen requested that the trial court instruct the jury on murder as a lesser included offense of aggravated murder. The trial court did so, but only as to Count One (aggravated murder with prior calculation and design), and refused to give any lesser-included-offense instruction on Count Two (felony-murder). Allen claims that the trial court's refusal to give this lesser-included-offense charge was erroneous.

{¶ 52} An instruction on a lesser included offense is required where the evidence presented at trial would reasonably support an acquittal on the crime charged and a conviction on the lesser included offense. *State v. Tyler*, 50 Ohio St.3d at 36, 553 N.E.2d at 591. The lesser-included-offense instruction for Count Two in this case was required if the jury could reasonably have found that Allen killed English, but not while trying to rob her. See *id.*

{¶ 53} Assuming *arguendo* that the trial court did err in failing to give the lesser-included-offense instruction on Count Two, that error was harmless, because

16

the jury actually did find that a robbery took place when it convicted Allen on Count Three - aggravated robbery. Given that the jury did find Allen guilty of aggravated robbery, it follows that the jury would have convicted Allen of aggravated murder on Count Two even if given the lesser-included-offense option. Any error in not giving the lesser-included-offense instruction did not enhance "the risk of an unwarranted conviction" on Count Two. See *Beck v.Alabama* (1980), 447 U.S. 625, 638, 100 S.Ct. 2382, 2390, 65 L.Ed.2d 392, 402-403, limited on other grounds, *Harmelin v. Michigan* (1991), 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836.

## 2. "Acquittal First" Instruction

{¶ 54} Although the trial court did instruct the jury on murder as a lesser included offense to aggravated murder on Count One, Allen contends that instruction barred the jury from considering murder without first acquitting him of aggravated murder. Absent a showing of plain error, Allen waived this claim because he failed to object to the instruction. Allen has failed to make a showing of plain error. This court has previously held that an acquittal-first instruction is erroneous. *State v. Thomas* (1988), 40 Ohio St.3d 213, 219-220, 533 N.E.2d 286, 292-293. In this case, however, the trial court did not give an acquittal first instruction; rather, the court instructed the jury as follows: "If you find the defendant not guilty of aggravated murder, you will then proceed with your deliberations and determine whether * * * the defendant is guilty or not guilty of murder." Although not ideal,[4] this instruction does not require unanimous acquittal on the crime charged before the jury can move on to consider the lesser included offense. See *id.* The *Thomas* court found an instruction substantially similar to the one given in this case acceptable.

---

4. A better instruction would incorporate the "inability to agree" language adopted in Thomas, *supra.*, at 220-221, 533 N.E.2d at 293.

### 3. Denial of "Mercy" Instruction

{¶ 55} Next, Allen complains of the trial court's denial of his request to instruct the jury that they could consider sympathy arising from the mitigating evidence and that they could consider mercy. Allen also complains of the court's instruction that the jury "must recommend" death if aggravation outweighed mitigation.

{¶ 56} The jury's decision should not be based on sympathy or mercy, which are not mitigating factors and are thus irrelevant to sentencing. *State v. Landrum*, 53 Ohio St.3d at 123, 559 N.E.2d at 728; *State v. Lorraine* (1993), 66 Ohio St.3d 414, 417-418, 613 N.E.2d 212, 216-217. Permitting the jury to consider sympathy and mercy would violate the well-established principle that the death penalty must not be administered in an arbitrary, capricious or unpredictable manner. *California v. Brown* (1987), 479 U.S. 538, 541, 107 S.Ct. 837, 839, 93 L.Ed.2d 934, 939; *Lorraine*, 66 Ohio St.3d at 417, 613 N.E.2d at 216. Accordingly, there was no error in the trial court's denial of the requested sympathy and mercy instructions. Furthermore, the court's instruction that the jury must recommend the death penalty if the aggravating circumstance outweighed the mitigating factors is consistent with R.C. 2929.03(D)(2) which sets forth the guidelines for imposing sentence in a capital case.

### 4. Felony-Murder Instruction

{¶ 57} Allen next claims the trial judge erred when, during her instruction on the felony-murder specification (R.C. 2929.04[A][7]), she failed to state that, to find Allen guilty, the jury must find that he was the principal offender or that he killed with prior calculation and design. Allen claims this omission is reversible error.

{¶ 58} Again, Allen did not object at trial and therefore waived this issue, absent plain error. *State v. Underwood* (1983), 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332.

**{¶ 59}** The failure to give a jury instruction is not plain error, unless, but for the error, the outcome of the trial would have been different. *State v. Long,* 53 Ohio St.2d at 97, 7 O.O.3d at 181, 372 N.E.2d at 808. The trial court's omission does not constitute plain error, because the jury actually did find prior calculation and design in this case. The jury convicted Allen of aggravated murder, R.C. 2903.01(A), on Count One, and the judge expressly told the jury that it had to find prior calculation and design if it found him guilty of that count.

**{¶ 60}** Allen's thirteenth proposition of law is overruled in its entirety.

## C. Prosecutorial Misconduct

**{¶ 61}** In his twelfth proposition of law Allen alleges several instances of prosecutorial misconduct. Allen raised no objection to many of the comments he challenges and therefore these alleged improprieties are waived, absent plain error. *State v. Williams*, *supra.*; *State v. Greer* (1988), 39 Ohio St.3d 236, 530 N.E.2d 382. We have reviewed these prosecutorial comments and find no plain error.

**{¶ 62}** Allen also complains of the prosecutor's comment regarding his lack of organic brain damage and the prosecutor's question concerning Allen's prior not guilty by reason of insanity pleas. Allen objected in both instances and both of these objections were sustained. Furthermore, Allen failed to request the curative instruction he claims should have been given.

**{¶ 63}** Lastly, the prosecutor's comment on Allen's unsworn statement was within the guidelines of *State v. DePew*, *supra,* at paragraph two of the syllabus, because the prosecutor merely commented that Allen's statement was not made under oath, in contrast to testimony of all the other witnesses.

**{¶ 64}** Allen's twelfth proposition of law is overruled.

## D. Ineffective Assistance of Counsel

**{¶ 65}** In his nineteenth proposition of law, Allen claims ineffective assistance of counsel. In order to prevail on this claim Allen must show that counsel's representation was deficient and that he was prejudiced by that

deficiency. *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693. The *Strickland* court defined deficient representation as representation which is unreasonable under prevailing professional norms. In order to show prejudice, Allen must show a reasonable probability that, but for counsel's unprofessional errors, the result would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the case. *Id.* at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 698. Allen's claims of ineffective representation are discussed below.

*1. Motions to Suppress*

{¶ 66} Allen claims his counsel inadequately investigated the facts behind a motion to suppress. Police seized several cigarette butts (some smoked by a Type O secretor) from Allen's bedroom. Allen's counsel moved to suppress that evidence, alleging a warrantless search. However, at the hearing, counsel stated: "I'm unclear as to whether there was a warrant * * *." The prosecutor later produced the warrant. Defense counsel examined it, then withdrew the motion.

{¶ 67} Allen claims his counsel was ineffective because he was ignorant of the warrant's existence due to inadequate investigation. The record does not show what investigations counsel made so we are unable to evaluate the sufficiency of those investigations. Nor has Allen shown how he was prejudiced. Since a warrant existed, defense counsel's knowledge of it is inconsequential.

{¶ 68} Next, Allen claims his counsel should have moved to suppress the bus driver's identification of him based on the use of a single photograph. Since we have previously found that this identification procedure was reliable under the totality of the circumstances, defense counsel's failure to move to suppress did not "render the [trial's] result unreliable." *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064. 80 L.Ed.2d at 693.

*2. Ineffective Assistance in Penalty Phase*

**{¶ 69}** Allen next argues that it was ineffective for his counsel to ask psychologist Dr. Robert Kaplan ("Kaplan") whether Allen's illness would be "treatable" over a thirty-year imprisonment. Kaplan said it was "possible" but uncertain, leading the prosecutor to ask if Allen could kill again. Kaplan replied: "It's certainly a possibility." The asking of this question constituted neither deficient performance nor was it prejudicial. This question was of some benefit to Allen because Kaplan answered that it was possible that Allen's condition was treatable.

**{¶ 70}** Allen has identified no act or omission that was both deficient and prejudicial and his nineteenth proposition of law is overruled.

## II

## Penalty Phase

### A. *Refusal to Appoint Neurologist*

**{¶ 71}** In his fifteenth proposition of law, Allen argues that the trial court erred by refusing to appoint a neurologist to investigate possible organic brain damage as a mitigating factor. R.C. 2929.04(B)(3).

**{¶ 72}** Just seven days before the date set for the penalty phase hearing, Allen moved for appointment of a neurologist to determine, by means of a CAT scan or MRI scan, whether he had brain damage. The motion was filed beyond the deadline previously set for motions related to the penalty phase. The court set the motion for a hearing. At that hearing, Allen introduced reports and an affidavit of psychologist Dr. Robert G. Kaplan. Kaplan was first employed by Allen's parents and then appointed by the court at Allen's request. Kaplan did two examinations and some testing of Allen. In his report relating to the first examination of Allen, Kaplan stated that, at age sixteen, Allen was knocked unconscious by a head injury. That report did not address possible brain damage. Kaplan's second report gave the results of two tests. The first was the Rorschach Ink Blot Test. Kaplan reported

that Allen's responses indicated a simplistic, "black or white" view of life. Kaplan stated that such a view is "characteristic of persons with limited intelligence or organic brain impairment," but there could also be un-organic causes as well. Kaplan then reported on the results of the Bender Visual-Motor Gestalt Test ("Bender test") which is a screening measure for organic brain impairment. In this report, Kaplan stated that the test results "would indicate little likelihood of any organic brain impairment." In the conclusions and recommendations section of this report, Kaplan attributed Allen's simplistic world view to a "motivation to avoid problems." Kaplan did not mention brain damage, nor did he suggest that a neurologist be obtained or that further testing be conducted. However, in an affidavit, dated just three days after his second report, Kaplan stated the following:

"* * *That I have examined David Allen and administered psychological tests which suggest the presence of organic brain damage, which if present could cause him to lack substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirement of the law.

"* * *That the absence or presence of organic brain impairment can be determined by a qualified neurologist in conjunction with the administration of a CAT or MRI scan."

{¶ 73} In considering Allen's assertion that a neurologist should have been appointed, we look to R.C. 2929.024, which entitles an indigent defendant charged with aggravated murder to such "investigation services, experts, or other services" as the trial court finds "reasonably necessary for [his] proper representation * * * at trial or at the sentencing hearing. * * *" A defendant must show, not just a mere possibility, but a reasonable probability that an expert would aid in his defense, and that denial of expert assistance would result in an unfair trial. *State v. Broom* (1988), 40 Ohio St.3d 277, 283, 533 N.E.2d 682, 691. Moreover, the determination of necessity lies in the trial court's discretion. R.C. 2929.024; see *State v. Jenkins* 15 Ohio St.3d at 193, 15 OBR at 336, 473 N.E.2d at 291.

**{¶ 74}** The trial court did not abuse its discretion by denying Allen's motion to appoint a neurologist. First, the request was filed after the court's deadline for such motions. Second, Allen failed to specifically demonstrate the reasonableness of the request. *State v. Broom*, 40 Ohio St.3d at 283-284, 533 N.E.2d at 691. Allen did not show a reasonable probability that an expert would aid in his defense. *Id.* Although Allen's ink blot test indicated a "simplistic * * * view of life" consistent with, but not necessarily caused by, brain damage, the Bender test indicated "little likelihood" of brain damage, and Kaplan's second report seems to rule out brain damage. Given that the Bender test is specifically designed to test for organic brain damage and that the results of the ink blot test were not conclusive as to brain damage, we find no abuse of discretion by the trial court in denying the motion to appoint a neurologist to further investigate Allen's claim of brain damage.

**{¶ 75}** Although Kaplan's affidavit states that test results suggest the presence of organic brain damage and that testing by a neurologist could determine the absence or presence of brain damage, the trial court could properly disregard the affidavit. It adds nothing substantive to the reports, fails to mention the Bender test, and ventures no opinion as to whether neurological testing is necessary.

**{¶ 76}** Accordingly, Allen's fifteenth proposition of law lacks merit.

### B. Factual Errors in Sentencing Opinion

**{¶ 77}** In his twenty-first proposition of law, Allen claims that the trial court's sentencing opinion contains factual mistakes, improperly treats the facts of the case as aggravating circumstances, and improperly weighs the mitigating factors.

**{¶ 78}** The trial court's opinion does contain two minor factual errors. The cigarette butts from Allen's bedroom were not identified as Dorals. And, there was no testimony that Allen boarded the bus "less than one mile from Mrs. English's home," as the court stated. We find these minor flaws inconsequential.

Furthermore, this court's independent review can correct flaws in the trial court's opinion. See *State v. Lewis* (1993), 67 Ohio St.3d 200, 204, 616 N.E.2d 921, 925.

### C. Court of Appeals' Independent Review

{¶ 79} In his twenty-second proposition of law, Allen charges that the court of appeals improperly performed its independent review under R.C. 2929.05(A). With its opinion, the appellate court filed a one-page "supplemental journal entry," summarily stating that the aggravating circumstance outweighed the mitigating factors and that the sentence was not disproportionate. Allen asks this court to remand to the court of appeals with instructions to explain why it so found.

{¶ 80} R.C. 2929.05(A) requires courts of appeals to independently review death sentences; it does not expressly require a detailed explanation. By contrast, R.C. 2929.03(F) requires that the trial court opinion explain why aggravation does or does not outweigh mitigation. If the legislature had intended that the court of appeals provide an explanation, it would have stated that requirement, as it did for trial courts in R.C. 2929.03(F).

{¶ 81} Allen incorrectly relies upon *State v. Gillard* (1988), 40 Ohio St.3d 226, 533 N.E.2d 272, and *State v. D'Ambrosio, supra*, to support his argument. In *Gillard*, this court remanded because the court of appeals had not reviewed the sentence at all. Here the supplemental entry says the court did perform an independent review. In *D'Ambrosio*, it appeared that the court of appeals reviewed the sentence without a full record. Allen makes no such claim here.

{¶ 82} We find no deficiencies in the court of appeals' independent review and, accordingly, we overrule Allen's twenty-second proposition of law.

### III

### Independent Review

{¶ 83} Having found that the evidence shows beyond a reasonable doubt that Allen committed the murder while committing or attempting to commit aggravated robbery, R.C. 2929.04(A)(7), we now turn to our independent

assessment of whether that aggravating circumstance outweighs the mitigating factors raised by Allen. Against the single specification Allen asks us to weigh two mitigating factors: diminished capacity, R.C. 2929.04(B)(3), and residual doubt of guilt.

### A. Diminished Capacity

{¶ 84} Dr. Kaplan testified regarding Allen's claim of diminished capacity. Kaplan testified that multiple mental diseases substantially impaired his capacity to appreciate the criminality of his actions and conform to the law. Dr. Kaplan diagnosed Allen as having post-traumatic stress disorder ("PTSD"). Allen told Kaplan he was raped in prison in 1981; Kaplan did not know if this was true, but noted that being raped can cause PTSD. Allen's symptoms included "intrusive recollections" of the trauma, excessive suspiciousness, and feelings of inadequacy, shame, and rage.

{¶ 85} Kaplan further testified that Allen's "sense of limited ability to handle" complex situations motivates him to oversimplify situations without regard for reality, due to "personality disorganization" and possibly also to low intelligence or brain damage. However, Kaplan said "intellectual laziness" may also play a part.

{¶ 86} On cross-examination, Kaplan testified that he "doubt[ed]" Allen would have murdered English had a policeman been sitting in her house. This testimony undermines Kaplan's finding of substantially impaired capacity to obey the law.

{¶ 87} We assign only modest weight to Dr. Kaplan's mitigation testimony.

### B. Residual Doubt

{¶ 88} Allen also raises "residual doubt" of his guilt as a mitigating factor. In an unsworn statement Allen insisted he was innocent and tried to explain the evidence. Based on the evidence as set forth in the body of this opinion, we find Allen's explanations unpersuasive and we have no doubt of his guilt.

**{¶ 89}** Accordingly, weighing the aggravating circumstance against the claimed mitigating factors, we conclude that the aggravating circumstance outweighs the mitigating factors beyond a reasonable doubt.

### IV  Proportionality Review

**{¶ 90}** We conclude that the death penalty is appropriate and proportionate in this case.  R.C. 2929.05(A).  This court has consistently upheld the death penalty in cases involving aggravated robbery-murder.  See, *e.g.*, *State v. Scott* (1986), 26 Ohio St.3d 92, 26 OBR 79, 497 N.E.2d 55; *State v. Holloway* (1988), 38 Ohio St.3d 239, 527 N.E.2d 831; *State v. Van Hook* (1988), 39 Ohio St.3d 256, 530 N.E.2d 883.

**{¶ 91}** Accordingly, the judgment of the court of appeals is affirmed.

*Judgment affirmed*

DOUGLAS, RESNICK and F.E. SWEENEY, JJ., concur.

MOYER, C.J., WRIGHT and PFEIFER, JJ., dissent.

————————————

**WRIGHT, J., dissenting.**

**{¶ 92}** The bedrock of our criminal justice system is the constitutional right to a trial by jury.  At the heart of this basic grant and due process of law is the constitutional guaranty that the jurors who decide a defendant's fate will be fair, impartial and free from bias or prejudice.  *Morgan v. Illinois* (1992), 504 U.S. 719, 727, 112 S.Ct. 2222, 2228, 119 L.E.2d 492, 501; *Ross v. Oklahoma* (1988), 487 U.S. 81, 85, 108 S.Ct. 2273, 2277, 101 L.E.2d 80, 88; *Wainwright v. Witt* (1985), 469 U.S. 412, 418, 105 S.Ct. 844, 849, 83 L.Ed.2d 841, 845; *Turner v. Louisiana* (1965), 379 U.S. 466, 471-472, 85 S.Ct. 546, 549, 13 L.E.2d 424, 431; and *Irvin v. Dowd* (1961), 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751, 755.

**{¶ 93}** A prospective juror should be removed for cause when he "discloses by his answers that he cannot be a fair and impartial juror or will not follow the law as given to him by the court."  R.C. 2313.42(J).  Additionally, a prospective juror

should be excused "if the court has *any* doubt as to the juror's being *entirely unbiased.*" (Emphasis added.) R.C. 2313.43. In the present case, the trial court deprived the defendant of important constitutional and statutory rights when it failed to remove for cause a juror who clearly demonstrated that she could not be impartial.

{¶ 94} Before this trial began, the trial judge asked all of the prospective jurors *en masse* to advise the bailiff if they had any personal problems with serving as a juror. Ms. Worthington, one of the prospective jurors, approached the bailiff, indicating that she had some problems with serving as a juror. She was then brought before the judge. She advised the court that she was previously unaware that she had been called to serve in a criminal case and that she did not feel that she could serve as a juror in such a case because only a few years earlier her brother had been shot and killed. The trial court did not take any action, stating that her ability to serve as a juror, in light of her experiences, would be addressed during the general voir dire.[5]

{¶ 95} When Ms. Worthington was finally called as a juror, she was the twelfth juror to be seated on the panel. At that point, the defendant had exhausted all six of his peremptory challenges. Ms. Worthington was questioned in open court in the presence of the balance of the seated jurors. During questioning, she again related the facts surrounding her brother's murder and the fact that she had sat through every day of that trial. She indicated without equivocation that she did not feel that justice was done in that case because the accused had been found not guilty. She stated without equivocation that she harbored feelings of bitterness and resentment as a result of the outcome of that trial. She further indicated that she was friendly with a number of police officers and the detectives and the prosecutor

---

5. The action of the trial judge in this instance appears to be inapposite to the judge's treatment of prospective juror Townes. Mr. Townes indicated he had been convicted of manslaughter, and the trial judge immediately excused him.

who were involved with her brother's case. The detective in her brother's case apparently was still in contact with her mother. Ms. Worthington also stated that she did not know if she could hold back her emotions when the coroner testified as she believed, apparently as a result of listening to earlier questioning, that the facts in this case were very similar to those in her brother's case. She then stated that the recent trial involving her brother's murder could be a problem if she served as a juror in the present case.

{¶ 96} Counsel for appellant asked that this juror be excused for cause, citing, among other reasons, her familiarity with potential state witnesses, her bitterness arising from the not guilty finding in her brother's murder case, and her emotional involvement as a result of her brother's case. As a result, counsel argued that she did not have the "detachment from these proceedings that ought to be required, particularly in a capital case." Defense counsel, of course, also pointed out there were many other jurors available for seating in the event that the trial court sustained their challenge for cause. The trial court overruled the challenge, stating that "[t]he juror, when questioned, unequivocally stated that she could be fair and impartial. * * * I don't see a problem with her serving."

{¶ 97} I do not see how any fair-minded individual can suggest that Ms. Worthington did not indicate a state of mind and view that cast the most serious sort of question on her ability to render an impartial verdict. In *Palmer v. State* (1885), 42 Ohio St. 596, paragraph three of the syllabus, this court stated: "A person called as a juror in a criminal case, who clearly shows himself, on his *voir dire*, not to be impartial between the parties, is not rendered competent by saying that he believes himself able to render an impartial verdict, notwithstanding his opinions, although the court may be satisfied that he would render an impartial verdict on the evidence." While it is true that the state made every effort to extract a statement to the effect that this juror believed herself capable of rendering an impartial verdict, I cannot think of a situation similar to this where this court or any

other court has indicated that a juror with experience and perspective similar to Ms. Worthington should not have been excused for cause.

**{¶ 98}** It is interesting to note that when questioned about this matter during oral argument to this court, the assistant prosecutor arguing this case indicated that Ms. Worthington was the type of juror he "wanted" on the jury. I must respectfully disagree. The state has an obligation to vigorously prosecute crime. However, the state also has a duty to uphold the law and protect the constitutional rights of those who are tried for crimes.

**{¶ 99}** The state argues that our decision in *State v. Broom* (1988), 40 Ohio St.3d 277, 533 N.E.2d 682, upholds the posture taken by the trial judge. In *Broom*, we held that the relevant inquiry with respect to the impartiality of the jury is focused on the jurors who eventually sat and decided the case, not those jurors who were excused pursuant to peremptory challenges. *Id*. at 287-288, 533 N.E.2d at 695. Consequently, we stated: "[I]n order to state a constitutional violation in this situation, the defendant must use all his peremptory challenges and demonstrate that one of the jurors seated was not impartial." *Id.* at 288, 533 N.E.2d at 695. In *Broom*, the defendant's impartiality challenge was unsuccessful because he had exercised a peremptory challenge to remove the juror who he alleged was biased.

**{¶ 100}** Consistent with our holding in *Broom*, if a biased juror has sat on a jury that ultimately sentenced a defendant who had preserved his right to challenge the trial court's failure to remove the juror for cause, the defendant's sentence must be overturned. Accord *Ross v. Oklahoma, supra*, 487 U.S. at 85, 108 S.Ct. at 2277, 101 L.Ed.2d at 88. That is exactly what occurred in this case. The appellant had exhausted all of his peremptory challenges by the time Ms. Worthington was seated on the panel. He challenged her for cause, but because the trial court failed to remove her, she was a member of the panel that found defendant guilty and sentenced him to death.

{¶ 101} I do not relish taking a position that would require a retrial of this particular matter. However, better to retry this matter now than two or three years hence as a result of a successful action in habeas corpus. Furthermore, this is a purely circumstantial case. There are serious questions concerning the admissibility of certain evidence with respect to the defendant's background and character and whether or not the defendant, if he did commit this crime, did so in the course of an armed robbery.

{¶ 102} Accordingly, for the foregoing reasons, I would reverse the decision of the court of appeals and remand this matter for a new trial.

MOYER, C.J., and PFEIFER, J., concur in the foregoing dissenting opinion.

_____

**APPENDIX**

"Proposition of Law No. I

{¶ 103} "A prospective juror should be removed for cause when she discloses by her answer that she cannot be a fair and impartial juror or if the court has any doubt as to the juror's being entirely unbiased.

"Proposition Law No. II

{¶ 104} "Defense counsel should be permitted to question prospective jurors concerning their views on capital punishment and the trial court should not excuse a juror for cause based on views concerning capital punishment until such questioning is allowed and unless those views would prevent or substantially impair the performance of their duties.

"Proposition of Law No. III

{¶ 105} "The existence of a prior offense is such an inflammatory fact that it should not be revealed to the jury unless specifically permitted under statute or rule.

"Proposition of Law No. IV

{¶ 106} "A conviction cannot stand when the state failed to present sufficient evidence to meet the legal requirements to sustain a conviction.

"Proposition of Law No. V

{¶ 107} "Evidentiary exhibits, sought to be introduced into evidence, should not be displayed to the jury prior to their admission.

"Proposition of Law No. VI

{¶ 108} "Victim character evidence is inadmissible in the guilt-innocence phase of a capital trial.

"Proposition of Law No. VII

{¶ 109} "A trial court should not admit evidentiary exhibits absent proper authentication.

"Proposition of Law No. VIII

{¶ 110} "Expert testimony should be excluded from evidence when no basis or foundation for such testimony is established and its admission is irrelevant.

"Proposition of Law No. IX

{¶ 111} "The use of a single photograph for identification purposes is impermissibly suggestive and destroys any reliability of the identification.

"Proposition of Law No. X

{¶ 112} "Duplicative and repetitive gruesome photographs are inadmissible in a capital prosecution.

"Proposition of Law No. XI

{¶ 113} "When the state admits actual physical exhibits into evidence, the introduction of photographs of those items, having no independent evidentiary value, is error since it only serves to cumulate the quantity of evidence and overstate the state's case.

"Proposition of Law No. XII

{¶ 114} "Misconduct by the prosecuting attorney in either the guilt-innocence or penalty phase of a capital case will serve as the basis of a reversal if

it denies the capital defendant a fair determination of either his guilt or innocence or the appropriate sentence in the case.

"Proposition of Law No. XIII

**{¶ 115}** "A jury in a criminal case must be instructed to find every element of the offense beyond a reasonable doubt.

"Proposition of Law No. XIV

**{¶ 116}** "Erroneous jury instructions in either the guilt-innocence or penalty phase of a capital case mandate reversal of the conviction and/or death sentence.

"Proposition of Law No. XV

**{¶ 117}** "An indigent defendant is entitled to the appointment of a defense expert, at state's expense, to assure he has a fair opportunity to present his defense.

"Proposition of Law No. XVI

**{¶ 118}** "The state may re-admit evidence from the guilt-innocence phase of a capital case into the penalty phase only if they are relevant to the death penalty specifications of which appellant was found guilty.

"Proposition of Law No. XVII

**{¶ 119}** "A trial court's use of the word 'recommendation' (when describing the jury verdict) in voir dire and penalty phase jury instructions denies a capital defendant a fair determination of his sentence by the jury.

"Proposition of Law No. XVIII

**{¶ 120}** "A trial court should not engage in communications with a deliberating jury without notice to and consultation with the parties involved.

"Proposition XIX

**{¶ 121}** "A capital defendant is entitled to the effective assistance of counsel throughout all stages of the capital prosecution.

"Proposition of Law No. XX

{¶ 122} "When a capital defendant is indicted and later convicted under both Sections of R.C. 2903.01 when there is but one victim, the trial court should sentence the defendant under only one of the counts and vacate the other.

"Proposition of Law No. XXI

{¶ 123} "When a trial court opinion in a capital case is replete with errors and fails to correctly weigh the aggravating circumstances and mitigating factors the appropriate remedy is vacation of the death penalty.

"Proposition of Law No. XXII

{¶ 124} "A capital appellant is constitutionally entitled to an independent review of his conviction and death sentence by both the court of appeals and the Ohio Supreme Court.

"Proposition of Law No. XXIII

{¶ 125} "The Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Sections 2,9,10 and 16, Article I of the Ohio Constitution establish the requirements for a valid death penalty scheme. Ohio Revised Code, Section[s] 2903.01, 2929.02, 2929.021, 2929.022, 2929.023, 2929.03, 2929.04 and 2929.05, Ohio's statutory provisions governing the imposition of the death penalty, do not meet the prescribed requirements and thus are unconstitutional, both on their face and as applied."