OPINION
Defendant Ian M. Duran appeals the judgment and sentence of the Hancock County Court of Common Pleas, following a jury verdict finding him guilty of aggravated murder with one specification, conspiracy to commit aggravated murder, aggravated arson, and tampering with evidence. The jury acquitted defendant of a second specification attached to the aggravated murder charge.
In early 1997, Larry Snyder lived at 708 West North Street in Fostoria with Todd Peace and Scott Seibert. All three men were friends of defendant Ian Duran. In late January 1997, Todd Peace discovered items he recognized as belonging to his girlfriend's grandmother in Snyder's bedroom. Suspecting that Snyder had been responsible for a recent burglary of Peace's girlfriend's grandmother's home, Peace contacted the Fostoria police department and an officer came to the North Street residence and took a report. Although it was apparently unknown to Peace at the time, evidence adduced at trial suggested that both Seibert and defendant Ian Duran were involved in the burglary along with Snyder. On Wednesday, January 22, 1997, Peace called police for a second time and assisted them in apprehending Larry Snyder. While Snyder was in jail, Seibert and Peace apparently removed most of Snyder's belongings from the North Street residence.
The State contends that defendant was fearful that Snyder might implicate him in the burglary, and that the defendant decided to kill Larry Snyder to prevent Snyder from doing so. The State argued at trial that the defendant and Scott Seibert concocted a plan to lure Snyder back to the North Street residence on the pretence of picking up the remainder of Snyder's belongings, and to kill him upon their arrival. Todd Peace testified that he was directed to remain at the house and lie in wait for Seibert, Snyder and the defendant to arrive. Peace also testified that it had been arranged for Snyder to be the second person through the door.
Once Snyder entered the house, all three men attacked him. The accounts of the attack given at trial vary in their particulars, but the evidence indicated that at some point during the assault, possibly even after Snyder lost consciousness, the defendant repeatedly struck Snyder in the head with a hatchet. Snyder was also beaten with a tire iron from behind during the assault. After Snyder lost consciousness Seibert was dispatched to fill a can with gasoline, and the three men set the house on fire to conceal the crime. The coroner testified that Snyder suffered thirteen chop wounds which, together with blunt trauma injuries, were the likely cause of Snyder's death, but that he remained alive long enough to breathe in soot and toxic fumes from the fire.
Based largely on the testimony of Todd Peace, the State advanced the theory at trial that defendant was the mastermind behind both the murder and the subsequent fire. Although the defendant initially attempted to present an alibi defense, he took the stand at trial and admitted that he was involved in the murder. However, at certain points during his testimony he denied planning the crime, and also stated that his intention was to beat Snyder up, not to kill him. On the other hand, the defendant also acknowledged without explanation previous statements to police officers essentially admitting a plan and also described other specific acts and decisions on his part leading to the death of Snyder.
Defendant now appeals the jury's verdict, and asserts two assignments of error with the trial court's judgment.
 THE TRIAL COURT ERRED IN DENYING MR. DURAN'S WRITTEN REQUEST FOR A JURY INSTRUCTION ON A LESSER INCLUDED OFFENSE OF MURDER.
 THE COMMENTS OF THE PROSECUTING ATTORNEY DURING CLOSING ARGUMENT VIOLATED MR. DURAN'S PRIVILEGE AGAINST SELF-INCRIMINATION AS GUARANTEED BY THE 5TH AND 14TH AMENDMENTS OF THE UNITED STATES CONSTITUTION.
Defendant first argues that the trial court should have granted his request for a jury instruction on the lesser included offense of murder. Murder is clearly a lesser included offense of the crime of Aggravated Murder. See, e.g., Turner v. Shipley
(November 12, 1996), Allen App. No. 1-96-47, unreported, 1996 WL 666727 at *1. Ohio's aggravated murder statute provides that "No person shall purposely, and with prior calculation and design, cause the death of another * * *." R.C. 2903.01(A). In contrast, Ohio's murder statute provides that "No person shall purposely cause the death of another * * *." R.C. 2903.02(A). As the Eleventh District has observed, "the sole distinction between these offenses is the element of prior calculation and design."State v. Bailey (1992), 90 Ohio App.3d 58, 72.
Generally, trial courts are required to give a jury instruction on a lesser included offense "where the evidence presented at trial would reasonably support an acquittal on the crime charged and a conviction on the lesser included offense."State v. Allen (1995), 73 Ohio St.3d 626, 637 (subsequent history omitted); accord State v. Solomon (1981), 66 Ohio St.2d 214, paragraph two of the syllabus. In this case, defendant was entitled to an instruction on the lesser included offense of murder "only if the jury, viewing the evidence in the light most favorable to the defense, could have had a reasonable doubt as to prior calculation and design, but yet could find that [defendant] purposely killed [Snyder]." State v. Keenan (1998), 81 Ohio St.3d 133,139-40 (subsequent history omitted). In this context, "prior calculation and design" requires "`a scheme designed to implement the calculated decision to kill.'" State v. Awkal (1996) 76 Ohio St.3d 324,330 (subsequent history omitted), quoting State v.D'Ambrosio (1993), 67 Ohio St.3d 185, 196.
Purposefulness, on the other hand, may be established by the intentional use of an inherently dangerous weapon during the commission of a felony that results in death. See State v. Eley
(1996), 77 Ohio St.3d 174, 180 (subsequent history omitted). Accordingly, if the jury could have had a reasonable doubt whether defendant implemented a prior, calculated decision to kill Larry Snyder, but could find beyond a reasonable doubt that the defendant had merely used an inherently dangerous weapon when Snyder was attacked or otherwise purposely caused Snyder's death without prior calculation and design, then defendant was entitled to the murder instruction.
At trial, the court initially granted the defendant's request for a jury instruction on the lesser included offense of murder at the close of the defense case. In closing argument, both the prosecution and defense counsel focused heavily on the element of prior calculation and design. However, neither specifically stated that the defendant could or should be found guilty of murder. As a result, after closing arguments the trial court changed its position and decided not to give the murder instruction.
THE COURT: No one argued lesser included offense.
 MR. MILLER: I wasn't going to.
 THE COURT: Is the State requesting a charge lesser included offense? [sic]
 MR. MILLER: No, Your Honor.
 THE COURT: It's the State's prerogative. Therefore I am not going to charge on lesser included offense in order to reach they would have to find the Defendant not guilty of aggravated murder [sic], and counsel, I am not going to charge on it the lesser included offense.
 MR. MILLER: Thank you.
 MR. NEEDLES: I have a couple of items — what was that again I didn't — you are not going — okay, I will place an objection, it is not an issue of arguing specifically but arguing the fact and for the jury to determine not to stand up and say before the jury, that an individual committed this offense. You know I believe it should be given and my argument was intended specifically on that point. I didn't use those words.
 THE COURT: Your argument is to the absence of alibi not the charge.
 MR. NEEDLES: Prior calculation and design.
 THE COURT: Which gets you a not guilty verdict which is better than the lesser.
 MR. NEEDLES: I understand but it is also the same as murder.
 THE COURT: Understand your objection, it is noted for the Record also.
From the foregoing exchange, it appears that the trial court believed that for the defendant to be entitled to a jury instruction on murder, it was incumbent upon defense counsel to directly argue to the jury that the defendant might be found guilty of murder. The trial court also apparently thought that in the absence of such an argument it becomes the State's decision whether the instruction should be given. In short, the trial court appears to have treated the defendant's request for a lesser-included instruction as if it were in the nature of an affirmative defense. This position is without support in the law, and the trial court's failure to give the instruction for this reason was improper.
The State argues, however, that any error generated by the trial court's failure to instruct the jury on murder was rendered harmless by the jury's subsequent guilty verdict on the conspiracy charge. R.C. 2923.01(A) (1) reads, in relevant part:
 No person, with purpose to commit or to promote or facilitate the commission of aggravated murder * * * shall * * * [w]ith another person or persons, plan or aid in planning the commission of [aggravated murder].
The State contends that the jury's verdict of guilty on the conspiracy charge supports a conclusion that the defendant did act with prior calculation and design. Specifically, the State argues that on these facts the conspiracy statute's requirement of a "plan" is equivalent to a determination that the defendant acted with prior calculation and design. We are compelled to reject this argument.
For one thing, the elements of conspiracy do not correspond exactly with R.C. 2903.01(A)'s requirement of prior calculation and design, and it is the State's burden to prove beyond areasonable doubt each element of an offense. As such, we believe it is inherently inappropriate to attempt to use a verdict on one charge to bolster the jury verdict on a second charge. In any event, it is equally possible that the jury reached its determination on the conspiracy charge as a result of its determination on the aggravated murder charge, rather than the other way around as the State argues.
More importantly, whether the jury verdict is supported by the evidence or by other verdicts in the case is not really the issue where the propriety of a lesser-included instruction is in question. As noted above, the standard of review we must apply is whether there was any evidence presented at trial which would reasonably support both an acquittal on the crime charged and a conviction on the lesser included offense. See, e.g., Solomon,66 Ohio St.2d 214 at paragraph two of the syllabus. The purpose of a lesser included offense instruction is to provide the jury with a correct statement of the law that applies to the case they are to decide. See generally, 23A Corpus Juris Secundum (1989) 206-07, Criminal Law, Section 1302. Appropriate and proper jury instructions are essential components of a fair trial. Cf. Statev. Baker, (1993) 92 Ohio App.3d 516,536 citing Pickering v. Cirell
(1955), 163 Ohio St. 1. Where the trial court has refused to give an instruction properly requested and to which the defendant was entitled, the court invades the province of the jury and impinges on the defendant's constitutional right to due process. Cf.Hopper v. Evans (1982), 456 U.S. 605, 371-73 (subsequent history omitted), construing Beck v. Alabama (1980), 447 U.S. 625. Because the jury's aggravated murder verdict was based upon the instructions it was provided, any error in failing to also provide additional instructions as to a lesser included offense cannot be cured by the jury's verdict on a different charge. Rather, we must determine whether the trial court's failure to instruct on the lesser included offense of murder for erroneous reasons was in fact erroneous, based on the evidence in the record and the standards of review set forth earlier in State v. Allen and Statev. Solomon.
At trial, prosecution witness Tara Sumpter repeatedly testified that the defendant had told her after the crime but prior to his arrest that the plan was to "was to beat him up actually. * * * * [It was a] plan just to beat him up." Prosecution witness Sherri Miller also testified that defendant had told her after the crime but prior to his arrest that the plan was "just to beat him [Larry] up." Defendant himself admitted his role in Snyder's murder, but testified at trial that he, Seibert and Peace had only planned to assault Snyder. However, on cross-examination, the defendant admitted that he had previously told Detective Michael Clark that "[w]e planned on doing it quick, but it took longer than I planned," and admitted that he had attacked Snyder with a hatchet.
Thus, in essence, the defendant placed testimony before the jury in which he both acknowledged and refuted the planned killing of Snyder as described by Todd Peace. At first glance, the foregoing discrepancies would seem to require a jury determination as to which version of defendant's testimony to believe, hence mandating a lesser included instruction in this case. The problem we have with such a disposition is that the only evidence as to the cause of death in the record is the testimony of the deputy coroner/forensic pathologist that Snyder's death was caused by the blunt and sharp trauma, consistent with the use of theboth the blunt and sharp trauma, consistent with the use of the tire iron and the hatchet. As a result, the defendant's guilt or innocence of any homicide is entirely linked to his use of the hatchet. Moreover, there are only two versions in evidence as to how the hatchet was used in this case. This has a significant and determinative impact on what verdict the jury could reasonably
return for purposes of our appellate review of the trial court's decision not to give a lesser included instruction. Cf. State v.Scruggs (April 23, 1980), Hamilton App. Nos. C-790391, C-790408 at *2-3 (per curiam).
On the one hand, the jury could believe or disbelieve that Snyder was assaulted with the hatchet and tire iron immediately upon entering the apartment as described by Todd Peace.
Q: When they came in the door, did you hit Ian?
 A: No.
 Q: You only hit Larry?
 A: Yes.
 Q: Did you hit Scott?
 A: No.
 Q: Did Larry fall to the floor?
 A: No.
 Q: In fact, Scott grabbed him, correct?
 A: Yes.
 Q: Did you hit him after Scott grabbed him?
 A: No.
 Q: And Scott yelled finish it?
 A: Yes.
 Q: And then it's your testimony that Ian got a hatchet?
 A: Pulled a hatchet out from behind the chair, yes.
However, if the jury believed Todd Peace's testimony that the defendant gained access of the hatchet and used it to assault Snyder immediately upon entering the house, there is no reasonable basis on those facts for acquitting the defendant of aggravated murder. Moreover, there is no specific testimony in the record to support an intermediate conclusion that, for example, the defendant somehow grabbed a hatchet during the initial assault and without any prior calculation and design, committed murder.
On the other hand, the jury might reasonably reject the testimony of Todd Peace and accept the defendant's version of events. However, the testimony of the defendant describes two distinct assaults upon Snyder.
 We walked into the house and made about, we made, I didn't never made it into the house [sic], and then Todd came from behind the door and hit Larry with something, one of them things over there. And he started hitting him, and then, you know, I jumped in, Scott jumped in, we all started to punch and kick him. And you know, Todd is so big that when he was hitting Larry in the head, it just did a lot of damage to him.
 * * * *
 I had sometime, I don't, I don't know during all of this punching and kicking, Todd was off and on hitting him with the tire iron, and at one time I did get hit in the back of my head with the tire iron and I did kind of, you know, I don't want to say got knocked out or blacked out, but I did, you know, I probably did. But I got up, got up sometime, I don't know if it was a second or two or an hour, but I got up and they were still beating Larry with a, with a tire iron. He was on the chair at this time. And his body was pretty limp. It wasn't, it wasn't real moving [sic].
 And then, you know, I just got up, you know, it was real confused. I didn't know how bad he was hurt, so we [sic], until we had turned on the light. And we saw, I saw, I don't know what they saw, but I saw his whole side of his head just, was just destroyed. And he was not moving, he wasn't fighting, never got up and wrestled, never, he just was not moving. I don't even know if he was breathing, he was just limp.
 And then it just got real helter-skelter after that, we didn't know what to do. At one point we were just like, you know, we were just, well, what are we going to do, should we call the police, should we, what should we do. We were going to call the police at one point but we decided to make it look like Larry had broken into the house and Todd had to get up and defend his house * * *.
 He, you know, was real violent, you know, he got, he couldn't control himself, and he said the police would believe it if he said that it was just him and he defended himself when Larry was trying to break into his house. And I was, I was told to leave, and that, leave, get out of here [sic]. I said, no, I came over here, I'm part of this, you know, came here, you know, I am not leaving. You know, whatever, whatever you go through I am here.
 And so we decided to make it look like it was an accident. Then I don't remember if we were going to make it look like the T.V. or the big metal table was metal and glass table, it was pretty heavy, we were going, either that or the T.V. look like it fell on his head somehow [sic]. So we, I know at this point the only real damage was on the front of his, front of his head.
 So then we put him over by where the T.V. and the table were, and we put him on his face down, and we had tipped the, I think it was the big metal table over on his head and we said this is, this ain't going to work. There is not enough, you know, whatever [sic]. So we got, we got more things, I am not quite sure, out of the utility room or whatever you want to call it, and including a hatchet [sic], and we wanted to give him damage on his head, and so I did use a hatchet, and like them pictures show on the back of his head, I hit him, I don't know how many times, quite a few. I am not very strong so it wasn't doing a lot when I hit him and he wasn't moving at this time. He wasn't talking, I am not even sure if he was breathing. He just was limp, every time he got hit, it just was like nothing, like a sack of potatoes. It was terrible but, and then after that, you know, we just didn't know what to do.
 We put, we put his body over by the, by the couch, and we decided since the couch was a lot heavier than the table or the T.V., we would put his head under the corner of the couch, and make it look like, you know, that happened. And there was a lot of blood every where [sic], and we said this ain't [sic], what can we, what can we tell the police happened [sic], you know, there is all this blood there, we weren't, couldn't see no marks on his head, we didn't know what the extent of the damage was.
 There was a lot of blood. And we didn't know what to do after that point. We washed all of the weapons off and at some point we decided that there was, this is not good, there is no way we can make any excuse for any of this. And we decided that we would just burn the house down, maybe, maybe the police would think that Larry burned the house down and the whole house fell upon him, that's what our idea was, you know. I guess at the time the whole house would fall down on him and they would never be able to tell any, any, you know, any damage that was done to it. He would be the only one in the house, the whole house would fall on him and nobody would be able to tell what happened to him that night.
 And that's all what really happened. Scott went and got gasoline, and poured it around the house, and they went and they waited down the street and I lit the fire * * *.
(emphasis added).
In the defendant's account of the initial assault, he admits assisting Todd Peace in attacking Snyder with a tire iron but denies any use of the hatchet at that time. Thus, in view of the coroner's testimony, there is no evidence in the record upon which the jury could reasonably conclude that the initial assault alone caused the death of Snyder. As a result, the defendant could not reasonably be convicted of either murder or aggravated murder based upon the initial assault with the tire iron but only upon his subsequent use of the hatchet on Snyder (and perhaps his conduct in starting the fire) in conjunction with the initial assault.
Yet according to the defendant's own testimony, set forth above, the hatchet was used only after a distinct pause following the initial assault upon Snyder, at which time the defendant and the others made a calculated decision to further assault Snyder with a variety of objects in order to make Snyder's death look like some kind of accident. As a result of this decision, the defendant carried out the planned assault with the hatchet, followed up with blows to Snyder's head from other objects and finally set fire to the house and Snyder. Although the defendant testified he was uncertain as to whether Snyder was alive before assaulting him with the hatchet, the only forensic evidence before the jury was that Snyder was alive at this time up to and including sometime during the fire.
In sum, there are only two versions in the record as to how this hatchet was used by the defendant as an essential instrumentality in the cause of death. While the defendant's version of events does not necessarily imply a long period of time prior to the decision to conduct the second assault, the use of the hatchet, under either the testimony of Todd Peace or the defendant, was unequivocally pursuant to a prior, conscious plan, sufficient in our view, to clearly constitute prior calculation and design.
Of course, the jury would be free to reject both versions and acquit the defendant outright. Moreover, it is perhaps always an inherent prerogative of a jury to piece together its own "composite" of what happened in a given case based upon the evidence that is in the record. However, only by rejecting the only existing testimony either as to the use of the hatchet or as to the cause of death, and then engaging in significant speculation as to what else (not in the record) might have "really happened," could the jury in this case acquit the defendant of aggravated murder while convicting him of murder. Plainly, a verdict reached under such circumstances is not "reasonably supported in the evidence" under the standards of Allen andSolomon. In short, reviewing courts are not compelled to reverse for failure to instruct on a lesser included offense solely on the basis that jury speculation could have conceivably led to an acquittal of the primary offense and conviction of the lesser offense.
Finally, it may be argued that despite some contradictory admissions at trial, the defendant also expressly denied he ever had any plan to kill Snyder and that such statements alone are sufficient to warrant a lesser included instruction in this case (on this point, we find the defendant's similar statements to the two prosecution witnesses after the crime to be in the same category). Construing these statements most favorably to the defendant, it appears that the defendant did not believe that the conduct which he admitted in his testimony was part of a plan or otherwise constituted prior calculation and design.
In determining whether such testimony compels a lesser included instruction, the question for us as a reviewing court becomes whether the jury may reasonably disregard the specific conduct the defendant has admitted in favor of the defendant's own contradictory characterization of that conduct. We believe the answer to that question must be in the negative. On the contrary, we believe the decision to grant a lesser included instruction is a decision of law to be made by the trial court or reviewing court based upon the specific facts in evidence about the conduct constituting the offense and not by the defendant's (or anyone else's) testimonial opinion as to the legal consequences of that conduct. In short, we do not believe a defendant who testifies and admits to the specific circumstances of prior calculation and design can, in essence, create an issue of fact warranting a lesser included offense simply by making a conclusory statement from the witness stand that his conduct was without prior calculation and design.
For these reasons, it is our conclusion that the trial court's decision regarding the lesser included instruction was correct, although rendered for an incorrect reason. The evidence presented at trial in this case would not reasonably support an acquittal on aggravated murder and a conviction on the lesser included offense of murder. See State v.Allen,73 Ohio St.3d at 637; State v. Solomon, 66 Ohio St.2d 214 at paragraph two of the syllabus. Accordingly, albeit on grounds different from those stated by the trial court, it is our conclusion that there was no error in the failure of that court to instruct the jury in this case on the lesser offense of murder. The defendant's first assignment of error is overruled.
In his second assigned error, the defendant argues that the prosecutor's rebuttal argument improperly commented upon his decision to remain silent between the time of his first statement and his testimony at trial.
 Ladies and gentlemen, you heard a lot of things for the first time today. And, yes, apply your common sense to what we heard for the first time today. The Defendant has had 22 months in jail to think about what he was going to tell you today for the first time.
 The first time he has told — —
 MR. NEEDLES: I am going to object.
 THE COURT: Overruled.
 MR. MILLER: First time he's told this story.
 MR. NEEDLES: May I approach just briefly.
At a bench conference outside of the hearing of the jury, defendant's counsel objected that the prosecutor's comments violated the defendant's right to remain silent and his right to counsel. Although the record is not entirely clear, it appears that the objection was to the prosecutor's reference to the twenty-two months between the defendant's initial statement to the police and his testimony at trial. The court overruled the objection, and the prosecutor returned to this theme again at the conclusion of his rebuttal argument.
 Did he tell Detective Clark we were just going to beat him up, things got of hand. No, twenty-two months ago he didn't say that. Did he tell his sister? No. He puts himself there, and he says, Todd Peace, Scott Seibert and I. He has just finished talking with his father. He could have easily told the truth. But it is much more convenient to tell it today. And they're guilty of killing Larry Snyder.
 MR. NEEDLES: Again I would renew my objection.
 THE COURT: Overruled.
Subsequently, defense counsel made a motion for mistrial based on the remarks, which the trial court overruled. Although the court apparently determined that jury instructions on the defendant's rights to counsel and to remain silent would be proper, no limiting instructions were given. Defendant's counsel did not specifically object to the court' failure to provide these instructions. See Crim.R. 30(A).
The relevant inquiry regarding a prosecutor's allegedly improper statements during closing argument is "whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant." State v. Smith
(1984), 14 Ohio St.3d 13, 14. This inquiry is guided by consideration of four factors: 1) the nature of the remarks, 2) whether an objection was made by counsel, 3) whether corrective instructions were given by the court, and 4) the strength of the evidence against the defendant. See Sidney v. Walters (1997),118 Ohio App.3d 825, 829. Finally, courts must also be mindful of the general maxim that prosecutorial misconduct is not grounds for reversal unless it so taints the proceedings that it deprives the defendant of a fair trial. See, e.g., State v. Phillips (1995),74 Ohio St.3d 72, 90 (subsequent history omitted).
In Doyle v. Ohio (1976), 426 U.S. 610, 619-620, the United States Supreme Court held that it violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution to impeach a testifying defendant based on the fact that the defendant remained silent after receiving a Miranda warning.
 Doyle emphasized the unfairness of inviting a defendant to rely on the Miranda warnings' implied promise that his silence cannot be used against him, and then, in fact, using his silence against him. However, * * * a defendant who chooses to talk has not relied on that promise with respect to what he talks about.
State v. Gillard (1988), 40 Ohio St.3d 226, 231, overruled on other grounds by State v. McGuire (1997), 80 Ohio St.3d 390, 402. Under the Ohio Supreme Court's interpretation of Doyle, it is clear that the prosecutor could properly comment on the perceived discrepancies between the defendant's statement to the police and his testimony at trial. The defendant, however, argues that the prosecutor's reference to his "twenty-two months" between statements impermissibly allows an inference of the defendant's guilt based on his decision, presumably on the advice of his counsel, to remain silent for that period. The parties have not cited us to any cases addressing this situation, and our independent research has failed to uncover any authority on point. However, we believe it to be unnecessary to delve into any further analysis as to the constitutionality of the prosecutor's statements. It is clear that the statements did not prejudice substantial rights of the defendant, and even presuming that they unconstitutionally refer to the defendant's exercise of his Miranda rights, based on the entire record the prosecutor's references are so minor and so oblique as to be harmless beyond any reasonable doubt. Cf. United States v. Hasting (1983),461 U.S. 499, 507-12 (subsequent history omitted); State v. Gillard,40 Ohio St.3d at 232.
For the foregoing reasons, defendant's two assigned errors are overruled. The judgment of the Common Pleas Court of Hancock County is hereby affirmed.
Judgment affirmed.
 BRYANT, P.J., concurs.
 HADLEY, J., concurs in judgment only.