OPINION.
A jury found appellant Darren Gamble guilty of breaking and entering in violation of R.C. 2911.13(A), a fifth-degree felony, and rioting in violation of R.C. 2917.03(B), a first-degree misdemeanor. The trial court sentenced Gamble to one year in prison on the felony count and to six months of local incarceration on the misdemeanor count.
On appeal, Gamble raises five assignments of error, alleging that the trial court erred by (1) allowing his conviction against the weight of the evidence; (2) failing to sever his trial from that of his co-defendants; (3) failing to grant a change of venue in light of media coverage; (4) using incorrect jury instructions; and (5) ordering restitution as part of his sentence.
I. Discrepancies in the Verdict Form and the Sentencing Entry
We note that Gamble was tried jointly with co-defendants Reno Lattimore and Robert C. Davis. In this court's recent decision in Lattimore's direct appeal, we discussed certain discrepancies in the jury's verdict form and the sentencing entry. Because the same discrepancies occurred in Gamble's case, we address them briefly here.
As we noted in State v. Lattimore,[1] the trial court correctly instructed the jury on the lesser-included offense of rioting under R.C.2917.03(A)(1), but the verdict form stated that the jury had found Gamble guilty of rioting under R.C. 2917.03(B). We stated that the evidence presented to the jury was consistent with the offense of rioting as defined in the (A)(1) subsection, but inconsistent with its definition under subsection (B). Furthermore, rioting was the least degree of the offense charged in the indictment aggravated rioting.[2] We held that the reference to the wrong statutory subsection did not void the jury s verdict because the jury had been adequately advised of its responsibility under R.C. 2917.03(A)(1). Furthermore, we concluded that the sentencing entry's citation to R.C. 2917.02(A)(1) was simply a clerical error. Therefore, as in Lattimore, supra, we remand this case to the trial court to correct the typographical error in its sentencing entry.
 II. Background Facts
On April 11, 2001, around eleven o'clock in the evening, Cincinnati Police Officer Donald Meece reported for duty. At the time, rioting had just begun to occur in his district of the city. Up to that point, rioting had been occurring that day in the city's Over-the-Rhine area. As a result, police officers carried riot shields and riot helmets. Some police units were equipped with beanbag shotguns and foam rounds in order to address the disturbances.
At approximately two o'clock in the morning, on April 12, 2001, Officers Meece and Mark Schildmeyer were dispatched to a Deveroes store in the Avondale area. As the officers approached the store, they saw several people going in and out of the store through its broken windows and doors. Officer Meece testified that, as he and Officer Schildmeyer neared the store, more people came out of the store, "out of the windows, any which they could get out and they were crawling over each other to get out because they had [been] alerted that we had been in the area and we were approaching the Deveroes store." The people outside the store were yelling warnings to those still inside the store that the police had arrived. He and Officer Schildmeyer called for backup assistance.
Some of the people leaving the store were carrying merchandise and were loading it into cars. As the police approached, those in the cars fled from the area. Officer Meece testified that he and Officer Schildmeyer did not run in immediately to arrest those in the store because, with so many people in the darkened store, it was too dangerous. Officer Meece estimated that twenty or twenty-five people had left the store as they approached.
Clothing, glass, garbage cans, and trash were strewn over the ground. The police ran through the front doors of the store. There was no glass left in the doors, only the metal framing. The interior of the store was a mess — empty boxes on the floor, shelving overturned and trash dumped on the floor. Officer Schildmeyer testified that it looked like a tornado had just come through the store.
As the officers entered the store, they saw Gamble in the middle of the store. Officer Meece ordered Gamble to stop. Gamble stopped and put his hands up. Officer Meece repeatedly ordered him to get on the ground, but Gamble kept shifting his feet from side to side, as if he was trying to get away. Because Gamble would not comply with his orders, Officer Meece shot Gamble with a beanbag in the chest. When Officers Jason Lobenthal and Jeff Smallwood arrived to assist, Officer Lobenthal handcuffed Gamble.
Officer Lobenthal testified that he had been at the same Deveroes store earlier that same evening. At about 11:30 p.m., he and his partner had arrived to find forty or fifty people running from the store. The officers quickly checked the store, finding it to be "in complete disarray. The clothing racks were all knocked over. Clothing was all over, shoe boxes were empty and strewn all over." At that point, there was still merchandise in the store. The police officers stayed until Brian Edmonson, the store manager, arrived.
Officer Lobenthal told Edmonson that the officers would not be able to stay there all night to guard his store because they had so many police calls to respond to. He also told Edmonson that it was not safe for him to stay by himself. The police waited while Edmonson quickly surveyed the damage to the store, and then the police and Edmonson left. Officers Lobenthal and Smallwood returned to the Devoroes store at about 2:00 a.m., when they received the call for assistance from Officers Meece and Schildmeyer.
Brian Edmondson testified that he had worked at the store earlier that day and had had to close the store three hours early due to the looting. He said that, as he locked up the store at closing, "the store was full with merchandise. Pretty much just an average closing operation day. Everything was fine."
Edmonson testified that, after receiving a telephone call from a store employee, he had returned to the store at about midnight. When he arrived, Officers Lobenthal and Smallwood were already there. Edmonson estimated that, at that time, twenty-five to thirty percent of the store's merchandise had been stolen. The windows were not broken at that time. Edmonson was unable to secure the store at that point. The police officers suggested that, for his personal safety, Edmonson should leave the area.
At 7:30 the following morning, Edmonson went back to the store. By that point, over ninety percent of the merchandise had been stolen. He testified that the total inventory lost was worth approximately $131,000.
 III. Manifest Weight of the Evidence
In his first assignment of error, Gamble argues that his convictions for breaking and entering and rioting were against the manifest weight of the evidence. He claims that the evidence demonstrated only that he was found in a looted store during a riot.
When an appellate court reviews a judgment of the trial court to determine if it is contrary to the weight of the evidence, the appellate court sits as a "thirteenth juror" and may disagree with the factfinder's resolution of conflicting testimony.[3] "The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."[4] The discretionary power of an appellate court to grant a new trial, however, is to be used only "in the exceptional case in which the evidence weighs heavily against the conviction."[5]
The offense of breaking and entering occurs when a person, by force, stealth, or deception, trespasses in an unoccupied structure with the purpose to commit any theft offense as defined in R.C. 2913.01.[6]
Gamble claims that, since no one saw him break into the store, and no one saw him holding any merchandise, he could not have been convicted of the offense. We find no merit in this argument.
Stealth has been defined as "any secret, sly or clandestine act to avoid discovery and to gain entrance into or to remain within a [structure] of another without permission."[7] In this case, when the police arrived at the Deveroes store at 2:00 a.m., they saw people running out of the store with merchandise. Edmondson testified that no one had permission to be inside the store at that time. Although there was no testimony about how Gamble had entered the store, the fact that he must have entered the darkened store after closing through its broken doors or windows was sufficient to support a finding that he had trespassed by stealth, and that he was there to commit a theft offense.
The offense of rioting occurs when a person participates with four or more others in a course of disorderly conduct with the purpose to commit or facilitate the commission of a misdemeanor other than disorderly conduct.[8] Gamble argues that he "was not acting disorderly. He was simply standing there when arrested."
As police officers approached the store, twenty or more people were coming out of the store carrying merchandise. When the police officers entered the store, several people ran to an area that officers later discovered was used for storage. In all, seven or eight people were apprehended in the store. The jury reasonably could have found that Gamble was participating with the other looters, with the purpose to commit either theft or trespassing, as reflected by the jury's guilty verdict on the breaking-and-entering charge.
We have reviewed the entire record, weighed the evidence and all reasonable inferences, and considered the credibility of the witnesses; and we hold that the jury did not clearly lose its way in resolving conflicts in the evidence or create a manifest miscarriage of justice. Therefore, we overrule Gamble's first assignment of error.
 IV. Motion to Sever
In his second assignment of error, Gamble argues that the trial court erred by refusing to sever his trial from that of his two co-defendants. The joinder of defendants to avoid multiple trials is favored in the law.[9] Joinder is the rule rather than the exception, and the burden is upon the defendant to show good cause why a separate trial should be granted. Further, a defendant asserting that joinder is improper must make an affirmative showing that his rights will be prejudiced if a separate trial is not granted.[10] A trial court's denial of a motion to sever will not be reversed absent a clear showing of an abuse of discretion.[11]
Gamble claims that he was prejudiced because one of his co-defendants had an additional charge of falsification, and because the other co-defendant had to be wrestled to the ground by an officer. After reviewing the record, we conclude that the jury could have easily distinguished the one co-defendant's falsification charge from Gamble's charges. Moreover, we fail to see how another co-defendant's wrestling match prejudiced Gamble in any way, when the evidence demonstrated that Gamble was in a different location within the store, and that he, too, had to be subdued by police officers.
Because Gamble was not demonstrably prejudiced by the joinder, and because there is no showing that the trial court acted in an unreasonable, unconscionable or arbitrary manner in denying his motion for a separate trial, we overrule Gamble's second assignment of error.
V. Motion for Change of Venue
 In his third assignment of error, Gamble challenges the trial court's failure to grant a change of venue due to pretrial publicity surrounding the case. Gamble argues that the events involved the worst rioting in Cincinnati's history, and that the publicity surrounding the riots was "enormous."
A trial court may order a change in venue when it appears that a fair and impartial trial cannot be held in that court.[12] A decision not to change venue will not be reversed unless it is clearly shown that the trial court has abused its discretion.[13]
"[P]retrial publicity — even pervasive, adverse publicity — does not inevitably lead to an unfair trial."[14] It is well established that "a careful and searching voir dire provides the best test of whether prejudicial pretrial publicity has prevented obtaining a fair and impartial jury from the locality."[15]
The record demonstrates that the prosecution and the defense attorneys for each of the three co-defendants conducted thorough examinations of each prospective juror regarding exposure to news media about the events surrounding the offenses. Moreover, the trial court cautioned the jurors repeatedly throughout the trial not to read or listen to media reports about the events surrounding the case. In view of the voir dire
examination, which revealed no prejudice, we cannot say that the trial court abused its discretion in refusing to order a change of venue. Therefore, we overrule Gamble's third assignment of error.
 VI. Jury Instruction on Deliberations
In his fourth assignment of error, Gamble argues that the trial court incorrectly instructed the jury on the procedure for deliberating on a lesser-included offense by stating the following:
 If, however, you find that the State failed to prove beyond a reasonable doubt any one of the essential elements of the offense of Breaking and Entering, your verdict must be not guilty of Breaking and Entering and you will then proceed with your deliberations and decide whether the State has proven beyond a reasonable doubt all of the essential elements of the lesser offense of Criminal Trespass.
 Gamble claims that this was an "acquittal first" instruction. In State v. Mason,[16] the Supreme Court of Ohio considered a similar instruction:
 If you find the Defendant not guilty of Aggravated Murder, you will then continue with your deliberations and determine whether or not the State of Ohio proved beyond a reasonable doubt all the essential elements of the lesser crime of murder.
 The court concluded that such an instruction was not prejudicial because it was not an "acquittal first" instruction.[17]
In State v. Thomas, the Supreme Court of Ohio held that "acquittal first" instructions are invalid because they encroach "on the province of the jury to decide questions of fact and to arrive at a verdict based on all the evidence before it and all the various offenses on which it has been properly instructed."[18] The court upheld an instruction similar to that in the present case because the instruction did not "expressly require unanimous acquittal on the charged crime."[19] The court held that the instruction was not prejudicial to the defendant because it had "negligible coercive potential."[20]
Accordingly, we reject Gamble's contention that the instruction in this case was an "acquittal first" instruction.[21] We overrule Gamble's fourth assignment of error.
 VII. Restitution Order In his fifth assignment of error, Gamble argues that the trial courterred by ordering restitution as part of its sentence. The sentencingentry reflects that Gamble was ordered to "pay a fine" of $130,000. Butthe record clearly demonstrates that the court imposed a restitutionobligation on each of the three co-defendants. Therefore, we remand thiscase to the trial court to correct the typographical error in itssentencing entry, pursuant to Crim.R. 36.
 A court that sentences a felony offender must be guided by theoverriding purposes of felony sentencing, which are to protect the publicfrom future crime and to punish the offender.[22] In order to achievethese purposes, a court is required to consider, among other things, theneed for making restitution to the victim, the public, or both.[23]
 Under R.C. 2929.18(A), a court may sentence a felony offender to afinancial sanction, including restitution to the victim, in an amountbased on the victim's economic loss. "Economic loss" means any economicdetriment suffered by a victim, including any property loss incurred asthe result of the commission of a felony.[24]
 A financial sanction of restitution imposed under R.C. 2929.18(A) is ajudgment in favor of the victim of the offender's criminal act.[25] Theoffender subject to the restitution sanction is the judgment debtor.[26]Imposition of a financial sanction and execution on the judgment do notpreclude the exercise of any other power of the court to impose or enforcesanctions on the offender.[27] Once the financial sanction ofrestitution is imposed as a judgment, the victim may bring an action (1)to obtain execution of the judgment through any available procedure,[28]or (2) to obtain an order for the assignment of wages of the judgmentdebtor.[29]
 At sentencing, the court must determine the amount of restitution to bemade by the offender.[30] Before imposing the financial sanction, thecourt must consider the offender's present and future ability to pay thesanction.[31] The court may hold a hearing if necessary to determinewhether the offender is able to pay the sanction or is likely in thefuture to be able to pay it.[32]
 In this case, the record demonstrates that the trial court properlydetermined the amount of restitution. The court considered theuncontroverted testimony of the Deveroes store manager that approximately$131,000 worth of merchandise had been lost. The court noted that thisamount did not include the business's clean-up costs. The court indicatedthat it had also considered the victim-impact statements in the case. Inone statement, Deveroes auditor Lamar Casey indicated that the store hadsustained damages of $167,757.36. Attached to his statement was apreliminary list of the store's losses, which indicated that $130,753.03was attributable solely to lost inventory.
 The record further demonstrates that the trial court consideredGamble's present and future ability to pay the sanction. While Gamblecomplains that no hearing was held on his ability to pay, the trial courtwas not required to hold a hearing on this issue.[33] The courtresorted to numerous sources that were indicative of Gamble's ability topay restitution. In the presentence-investigation report, Gamble indicatedthat he had been attending General Equivalency Diploma ("GED") classes,and that he would soon apply to Cincinnati State to complete his GED. Atthe time of the offenses, Gamble had been registered to work through atemporary agency.
 In a letter to the court, Gamble said that he was attempting to earnhis GED so that he could attend college the following quarter forbusiness-management technology and communications technology. He saidthat he had been employed as a packager in an industrial plant.
 At sentencing, Gamble, his mother, his father, his grandmother, and hisdefense attorney addressed the court extensively. Gamble said that he hadalready enrolled in Cincinnati State, but that he was not yet able toattend due to the trial proceedings. Gamble told the court that he had agoal set for himself to own his own business within three years. He saidthat he was a barber and that he had been cutting hair for the past sixor seven years. He had learned the trade from his father. He told thecourt that, when he had been released on pretrial bond, he had gonestraight to work for a temporary service.
 Gamble complains that no hearing was held on his ability to pay therestitution. But a trial court is not required to hold a hearing tocomply with R.C. 2929.19(B)(6), although the court may choose to do sopursuant to R.C. 2929.18(E).[34] R.C. 2929.18(E) provides,
 A court that imposes a financial sanction upon an offender may hold a hearing if necessary to determine whether the offender is able to pay the sanction or is likely in the future to be able to pay it.
 The statutory language clearly vests the trial court with the discretion to hold a hearing on an offender's ability to pay a financial sanction such as restitution.
 While the trial court must consider the offender's ability to payrestitution, there are no express factors that must be taken intoconsideration, nor are findings required for the offender's ability topay.[35] All that is required under R.C. 2929.19(B)(6) is that thetrial court consider the offender's present or future ability to pay.[36]A court of appeals cannot modify a financial sanction unless it finds byclear and convincing evidence that it is contrary to law.[37]
 We cannot say that the trial court acted unreasonably, arbitrarily, orunconscionably by not holding a hearing on Gamble's ability to payrestitution, in light of the court's consideration of the presentencereport and Gamble's letter to the court, as well as the statements byGamble and his family regarding his work potential.[38] Accordingly, wehold that the trial court did not abuse its discretion by not conductingsuch a hearing. Nor can we say that the court's restitution order wascontrary to law where the record demonstrates that the court thoroughlyconsidered Gamble's present and future ability to pay.[39] We overruleGamble's fifth assignment of error.
 VIII. Conclusion
Accordingly, we affirm the trial court's judgment, but remand this case with instructions that the trial court correct Gamble's sentence to reflect that his conviction was for rioting under R.C. 2917.03(A)(1), and that the financial sanction imposed was restitution, rather than a fine.
Judgment affirmed and cause remanded for correction of sentence.
Doan, P.J., and Gorman, J., concur.
[1] (Feb. 22, 2002), Hamilton App. No. C-010488, unreported.
[2] See Lattimore, supra, citing R.C. 2945.75(A)(2).
[3] State v. Thompkins (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541,546-547.
[4] State v. Martin (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717,720-721.
[5] Id.
[6] See R.C. 2911.13(A).
[7] See State v. Ward (1993), 85 Ohio App.3d 537, 540, 620 N.E.2d 168,170.
[8] R.C. 2917.03(A)(1).
[9] State v. Thomas (1980), 61 Ohio St.2d 223, 225, 400 N.E.2d 401,404.
[10] See State v. Roberts (1980), 62 Ohio St.2d 170, 405 N.E.2d 247.
[11] State v. Torres (1981), 66 Ohio St.2d 340, 421 N.E.2d 1288, syllabus.
[12] See Crim.R. 18(B); R.C. 2901.12(K).
[13] See State v. Coley (2001), 93 Ohio St.3d 253, 259, 754 N.E.2d 1129,1139, citing State v. Lundgren (1995), 73 Ohio St.3d 474, 479,653 N.E.2d 304, 313; State v. Maurer (1984), 15 Ohio St.3d 239, 250,473 N.E.2d 768, 780.
[14] Nebraska Press Assn. v. Stuart (1976), 427 U.S. 539, 554,96 S.Ct. 2791, 2800.
[15] State v. Davis (1996), 76 Ohio St.3d 107, 111, 666 N.E.2d 1099,1104, quoting State v. Bayless (1976), 48 Ohio St.2d 73, 98,357 N.E.2d 1035, 1051; State v. Howard (Nov. 15, 1995), Hamilton App. No. C-930963, unreported, discretionary appeal not allowed (1996),75 Ohio St.3d 1474, 663 N.E.2d 1301.
[16] (1998), 82 Ohio St.3d 144, 694 N.E.2d 932.
[17] Id. at 161, 694 N.E.2d at 951, citing State v. Allen (1995),73 Ohio St.3d 626, 638, 653 N.E.2d 675, 687; cf. State v. Thomas (1988),40 Ohio St.3d 213, 533 N.E.2d 286, paragraph three of syllabus.
[18] State v. Thomas (1988), 40 Ohio St.3d 213, 219, 533 N.E.2d 286,292.
[19] Id. at 220, 533 N.E.2d at 293.
[20] Id.
[21] See State v. Wright (Nov. 13, 2001), Franklin App. No. 00AP-985, unreported; State v. Overton (May 5, 2000), Lucas App. No. L-98-1410, unreported.
[22] R.C. 2929.11(A).
[23] Id.
[24] R.C. 2929.01(M).
[25] R.C. 2929.18(D).
[26] Id.
[27] Id.
[28] Id. These procedures include the following:
 (a) An execution against the property of the judgment debtor under Chapter 2329. of the Revised Code;
 (b) An execution against the person of the judgment debtor under Chapter 2331. of the Revised Code;
 (c) A proceeding in aid of execution under Chapter 2333. of the Revised Code, including:
 (i) A proceeding for the examination of the judgment debtor under sections 2333.09 to 2333.12 and sections 2333.15 to 2333.27 of the Revised Code;
 (ii) A proceeding for attachment of the person of the judgment debtor under section 2333.28 of the Revised Code;
 (iii) A creditor's suit under section 2333.01 of the Revised Code.
 (d) The attachment of the property of the judgment debtor under Chapter 2715. of the Revised Code;
 (e) The garnishment of the property of the judgment debtor under Chapter 2716. of the Revised Code.
[29] Id.; see, also, R.C. 1321.33.
[30] R.C. 2929.18(A)(1).
[31] R.C. 2929.19(B)(6).
[32] R.C. 2929.18(E).
[33] Id.
[34] See State v. Higgenbotham (Mar. 21, 2000), Belmont App. No. 97 BA 70, unreported; State v. Martin (2000), 140 Ohio App.3d 326, 338,747 N.E.2d 318, 327; State v. Karnes (Mar. 29, 2001), Athens App. No 99CA042, unreported, discretionary appeal not allowed (2001),92 Ohio St.3d 1444, 751 N.E.2d 482.
[35] See State v. Martin (2000), 140 Ohio App.3d 326, 338,747 N.E.2d 318, 328.
[36] R.C. 2929.19(B)(6); State v. Karnes, supra; State v. Martin,supra.
[37] See R.C. 2953.08(G)(2); State v. Kelly (2001),145 Ohio App.3d 277, 762 N.E.2d 479; State v. Blanton (Mar. 19, 2001), Butler App. No. CA99-11-202, unreported.
[38] Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219,450 N.E.2d 1140, 1142.
[39] See R.C. 2929.19(B)(6)